IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| UNITED STATES OF | ) | |
| AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:16-CR-00534 |
| | ) | |
| LOUIS DELYNN HANSEN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE THE HONORABLE CLARK WADDOUPS

July 10, 2017

Partial Trial Transcript
Trial Testimony of Louis Delynn Hansen

Laura W. Robinson, RPR, FCRR CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

**Appearances of Counsel:**

For the Plaintiff:   Kevin L. Sundwall
           Attorney at Law
           U.S. Attorney's Office
           111 South Main Street
           Suite 1800
           Salt Lake City, Utah 84111

           Andrew J. Kameros
           Attorney at Law
           US Department of Justice
           601 D Street NW
           Washington, DC 20004


For the Defendant:   Stephen R. McCaughey
           Attorney at Law
           Stephen R. McCaughey LLC
           9 Exchange Place
           Suite 600
           Salt Lake City, Utah 84111

           Louis Delynn Hansen
           Pro Se
           62 North 1160 East
           Orem, Utah

```
                         I N D E X
```

Examinations                                          Page

    **LOUIS DELYNN HANSEN**                                4
DIRECT EXAMINATION                                     4
BY MR. MCCAUGHEY
CROSS-EXAMINATION                                      19
BY MR. KAMEROS
REDIRECT EXAMINATION                                   38
BY MR. MCCAUGHEY

1          **Salt Lake City, Utah, July 10, 2017**

2                        **\* \* \* \* \***

3              (Trial testimony of Delynn Hansen)

4          THE COURT:  You are excused and it means you may

5     remain in the courtroom, if you wish.

6          THE WITNESS:  Thank you.

7          THE COURT:  Defense may call its next witness.

8          MR. MCCAUGHEY:  We call Delynn Hansen.

9          THE CLERK:  Raise your right hand.

10                    **LOUIS DELYNN HANSEN,**

11       called as a witness at the request of the Defendant,

12            having been first duly sworn, was examined

13                   and testified as follows:

14          THE WITNESS:  Yes.

15          THE CLERK:  Please take the witness stand.  Please

16     state your name and spell it.

17          THE WITNESS:  Louis Delynn Hansen, L-O-U-I-S

18     D-E-L-Y-N-N H-A-N-S-E-N.

19                    **DIRECT EXAMINATION**

20     BY MR. MCCAUGHEY:

21          Q.   Mr. Hansen, have you ever been arrested?

22          A.   No.

23          Q.   Have you ever been in trouble with the law?

24          A.   No.

25          Q.   And --

1          A.   I should say not previous to this.

2          Q.   Right.  I believe you -- in your opening

3     statement you talked about how you got in some financial

4     difficulties with your house?

5          A.   Yes.

6          Q.   Would you just briefly relay that again to the

7     jury so they can understand?

8          A.   My builder made some very costly mistakes that,

9     um, when he was reviewing the blueprints and submitted those

10    for bids, the lumber company he didn't notice when he got

11    the bid back that it did not include all of the big beams

12    for the roof.  It is an open house and it has these large

13    beams so there is no supporting walls on the inside so the

14    beams are very big, very expensive, and that was not in the

15    lumber estimate when he got that back.  He also made some

16    mistakes on getting estimates on the cement for the home and

17    the windows for the home.  And because of those three

18    things, he was way off.  He knew about it and didn't tell me

19    and went ahead with the home construction.

20         Q.   And so when that home was constructed, um, what

21    happened to the home?

22         A.   Well, we moved into it.  Um, he pushed the house

23    into sheriff's auction because the money ran out because of

24    the overrun on the lumber, the cement, and the windows, and

25    he hadn't been paid as the contractor.  So he came and told

1    me he says nothing personal, I'm just going to push your

2    house into sheriff's auction and you will just go ahead and

3    go to court and you'll save the house and you'll have to pay

4    all of the subs that haven't been paid including me.

5        Q.   And so did you end up, excuse me, did you end up

6    losing a lot of money on that house?

7        A.   Oh, it -- it cleaned me out.  I mean the stress

8    of moving into a new home and then all of a sudden instead

9    of just having the mortgage that you thought you were going

10   to have, now you've got the mortgage, you've got this list

11   of subs that after you've gone to court for three days and

12   the judge says, well, maybe it wasn't your fault but you

13   have got the value from the subs putting that into your home

14   and you need to pay the subs.  So I had to pay all of those

15   subs right off the bat.

16       Q.   And so also as a result of this losing money on

17   your house and paying these subcontractors, did you -- did

18   you get into debt with the IRS?

19       A.   Yeah.  Because I had these debts that I was court

20   ordered to pay, and, um, I had made those payments, um, I

21   don't work really good under stress and when stress hits me

22   and I'm self-employed, um, it -- it -- it impacts my

23   business and my business suffered.

24       Q.   But during this time, um, did you -- did you try

25   to make payments to the IRS during the --

1        A.   I believe I did make some.

2        Q.   Okay.  Um, did your house -- was your house

3   seized or --

4        A.   No, we stayed in it a number of years, and it

5   just -- it just -- things just kept adding up and finally

6   one day I just told my wife I says, you know what, this

7   might have been our dream home but it has become our

8   nightmare house and I says we just need to let it go.  And

9   so we -- we had to lose the home and move out and rent.

10       Q.   And so eventually you owed somewhere around 300,

11   400,000 to the IRS.  How did that happen?  What caused that

12   large amount?

13       A.   Well, it just -- it just starts with a small

14   amount and then like I said, I was making all these payments

15   to get the subs paid instead of paying the IRS, and then you

16   get a little bit further behind, and then the -- the -- the

17   penalties and interest start tacking on, and you're under

18   stress in your business and so your business starts

19   suffering because you're so distracted with your current

20   problems, and so all of a sudden it goes from 50,000 to

21   75,000 to 100.  And the higher it goes boy, the interest

22   starts tacking on lickety-split because it's a percentage of

23   what is owed.  And the next thing you know, you're 150,000,

24   200,000, 300,000, and then you just can't believe it and you

25   just go, how am I ever going to dig out of this hole.

1       Q.   And you tried to?

2       A.   Oh, I did.  I mean you can see, um, Friday --

3       Q.   Well you tried?

4       A.   The payments that were made continuously.

5       Q.   But you tried at first by going to Berkshire

6  Capital?

7       A.   Yes, I -- I had tried Berkshire --

8       Q.   Tell us a little bit about that?

9       A.   Um, I can't remember how I found them, but, um,

10  probably through e-mail I was contacted.  They usually see

11  who has got tax liens and they contact people.  So, um, I

12  went ahead and got back in touch with them and they says hey

13  we can -- we can reduce how much you owe them and then we

14  can get you on a payment plan that is affordable and take

15  care of this debt.  I says that sounds good.

16       Q.   About when was that, about what year, do you

17  recall?

18       A.   Oh, I don't recall the date.

19       Q.   Okay.  It was whatever date that the gentleman

20  from Berkshire Capital testified to?

21       A.   Yeah.

22       Q.   Okay.  And you did pay them a retainer to do

23  that?

24       A.   I did.  I paid them about $6,200.00 and 6,250 I

25  think it was.

1          Q.   Okay.  And what was the result of Berkshire

2     Capital?  What did they eventually do as far as a payment

3     plan or reducing your taxes?

4          A.   Well, this went on for a while and then all of a

5     sudden one day I remember getting an e-mail from them and

6     they had previously told me, well, we can probably work the

7     payments of about 4,000 a month.  I says oh, I could

8     probably handle that.  Then came the e-mail that told me

9     okay, we're ready to submit this to the IRS, um, we have

10    talked to them, and they want $50,000.00 down and then

11    $4,000.00 a month.

12         Q.   Was that possible for you?

13         A.   Oh my gosh, who has got $50,000.00 laying around?

14    I didn't.  And I told him there's no way I can do this.  And

15    I asked him how come nobody ever bothered to ask me what I

16    could afford to put down but they didn't.  So that deal

17    didn't amount to anything.

18         Q.   So somewhere during this -- about this same time

19    period you went to some seminars, right?

20         A.   I did.

21         Q.   And do you recall how many seminars you went to?

22         A.   We, my wife and I, went to two of them.  One in

23    Kissimmee, Florida and one in Las Vegas.

24         Q.   And you went to those seminars to try to help

25    you -- you thought there might be a way to resolve your tax

1    problems through these seminars?

2         A.   When we went to the -- we had talked to two

3    people who had attended a seminar from the same people in

4    Provo, and so we went and flew out to Florida, saw our

5    daughter and grand kids and then attended the seminar.  And

6    I met people there that said that they had debts with the

7    IRS anywhere from a few thousand to over a million dollars.

8         MR. KAMEROS:  Objection, hearsay, Your Honor.

9         THE WITNESS:  This is just my experience.

10        MR. KAMEROS:  I think he was testifying as to what he

11   was told.

12        MR. MCCAUGHEY:  We're not offering it for the truth,

13   just what he heard at the seminars.

14        THE COURT:  Again, I'm going to overrule the

15   objection.  Again, members of the jury, what he's relating

16   that he was told by other people is not offered and you may

17   not consider it for whether or not it was true.  It's simply

18   offered for the fact that he was told this and you can take

19   that into account in terms of considering what Mr. Hansen's

20   state of mind was at the time the events occurred that

21   you're going to make a decision on.

22        Q.   (By Mr. McCaughey)  So when you were trying to

23   resolve this problem by going to the seminars, how many

24   seminars did you go to?

25        A.   Two.  Um, the one in Kissimmee was smaller, maybe

1       100 people there.  The one in Las Vegas had about 500 people

2       there.

3              Q.   And did it cost you money to go to these

4       seminars?

5              A.   Oh, it did.

6              Q.   Do you recall how much you paid?

7              A.   Oh, a few hundred dollars.

8              Q.   Okay.  And how long were each of these seminars,

9       do you remember?

10             A.   Um, all day.

11             Q.   And did they give you materials or was it --

12             A.   They gave us some printed materials, yes.

13             Q.   And what -- what was the basic gist of what they

14      told you as to how to resolve your tax problem?

15             A.   Um, basically setting off debt that we would use

16      a closed account that stays open on the bank side for setoff

17      and discharge, and we -- they showed us in the booklet of

18      how to prepare these, putting certain information on the

19      front like EFT for -- "EFT only for discharge of debt," and

20      then what to do on the back, um, including under the

21      signature line "without recourse" which means if this is

22      submitted that -- that we're not held liable if they do not

23      get payment.  Um, we did all of those things.

24             Q.   And did they -- was it explained to you that it

25      had worked for other people?

1          A.   At the seminar in Las Vegas that had 500 people

2     in attendance, they had told people in advance if you wanted

3     to come up on stage and just briefly in a matter of a few

4     seconds tell your success stories you could.  And there were

5     a lot of people that got up and told success of having IRS

6     paid off, homes paid off, cars paid off.  I found it very

7     exciting.

8          Q.   Do they explain to you what -- why you -- why you

9     used a closed account?

10         A.   Because it stays open on the bank side for

11    setoff.

12         Q.   Okay.  So you didn't use a closed account to try

13    to defraud the IRS?

14         A.   No, it was just that was the mechanism they

15    instructed us to use.

16         Q.   Can you bring up Exhibit 125.  So this exhibit

17    that has been talked about a lot during this trial, you were

18    the one that filled this exhibit, this check out, right?

19         A.   Yes, I am the one that filled out the EFT.

20         Q.   Okay.  And you did that according to what you

21    were told to do at the seminar, right?

22         A.   Correct.

23         Q.   Did you add anything of your own volition on

24    here?

25         A.   No.

1       Q.   Okay.  And this closed account is made out in --

2   this closed account is someone else's name, Cody Hansen,

3   your son?

4       A.   Yes.

5       Q.   Why did you use Cody Hansen's check on a closed

6   account?

7       A.   I did not have a closed account and I wanted to

8   hurry and get this done.  And he just offered why don't you

9   just use my closed account rather than an open one.

10      Q.   So you did it with his knowledge?

11      A.   Uh-huh (affirmative).

12      Q.   And he was fine with that?

13      A.   He was fine.

14      Q.   Okay.  And the way it is on the back or on the

15  front of the EFT "for discharge only of debt only" and then

16  "the nonrecourse", that was all put on you because of what

17  you were taught at the seminar?

18      A.   Correct.

19      Q.   Did you have any intent to defraud the IRS?

20      A.   No.  All I wanted was -- I just wanted to get out

21  from underneath the debt that I owed the IRS.  And as I went

22  to the two seminars and talked to people that had success, I

23  -- I -- I says this is pretty crazy but they're saying it

24  works and I wanted something that worked that would get rid

25  of the debt that I owed the IRS.

1        Q.   And the sticky notes that you attached to each

2    one of those EFTs that you sent in, that was pursuant to the

3    instruction of the seminar?

4        A.   Yeah.  That just instructed the bank how to

5    properly put those into the night deposit and run them as a

6    one -- one-way reverse transfer.

7        Q.   Okay.  Now, you sent these EFTs into the IRS, how

8    many did you send in?

9        A.   Initially I sent one through another friend of

10   mine that had attended a seminar in Provo and he had a

11   closed account at Zions Bank.  We put that through and only

12   after some time much later did I find that it was not

13   submitted into the bank for processing.  We -- that's one of

14   the checks or the EFTs that we saw here on the screen and it

15   was not processed.

16       Q.   Okay.  But then you sent in some more EFTs,

17   right?

18       A.   Um, when it came time at the end of the year to

19   submit my 1040, um, Revenue Officer Darla Black said I want

20   you to send the 1040 to me and send me the --

21       MR. KAMEROS:  Objection, can we have some foundation,

22   Your Honor?  Darla Black was not part of this case until way

23   after those checks were submitted.

24       THE COURT:  Sustained.  You need to establish the time

25   frames.

1          Q.   (By Mr. McCaughey)  So any way, let's get to the

2     8 or 9 or 10, 11 EFTs that you sent in?

3          A.   Okay.

4          Q.   How many did you send in total?

5          A.   Um, 13.

6          Q.   Huh?

7          A.   13.  It has been said that I did 10, but I

8     actually did 13.

9          Q.   Okay.  And why did you send in 13 and you know --

10    let me withdraw that.  Were they all for the $425,000.00?

11         A.   No.  The first one -- the first one through Zions

12    Bank was for the exact amount of 300 something thousand

13    dollars.  The second one was $81,866.00.  That went with my

14    1040 to -- and sent into Darla Black.  And then the -- the

15    rest of them, the 11 of them, because I never heard anything

16    back from the first one that I sent through Zions Bank, um,

17    I just gave it some thought and I remember someone telling

18    me IRS doesn't always take these, um --

19         Q.   When you say?

20         A.   -- you might want to send a few at a time out to

21    different payment centers for the IRS.

22         Q.   When you say someone else told you that, someone

23    else where?

24         A.   Somebody at the seminar that had experience using

25    these.  So instead of just doing a few I says you know what,

1    I would really like this taken care of as quick as possible.

2    So, um, I looked on the website of the IRS, they had 11

3    payment centers.  I duplicated the process 11 times sending

4    one out to each payment center for $425,000.00.

5         Q.   Okay.  And was that -- was there any intent on

6    your part to do that in order to generate a refund to you?

7         A.   No.  I just wanted one to go through.  And, um,

8    this was what we were told about refunds.  If -- if they --

9         Q.   You said you were told?

10        A.   We were told at the seminars that if we received

11   a refund, do not cash it.  Keep it, that is your proof that

12   the EFT was accepted and processed and setoff the debt.

13        Q.   So this was in no way an attempt to get the

14   IRS --

15        A.   No, I never --

16        Q.   -- to send you a refund?

17        (Whereupon, the reporter asked the attorney and

18         witness not to speak on top of each other.)

19        THE WITNESS:  Oh, sorry.

20        Q.   (By Mr. McCaughey) So this was in no way an

21   attempt by you to get the IRS to send you a refund by

22   mistake?

23        A.   No.  I was not looking for a refund.  If they

24   sent me a refund check, I planned to hold on to it as my

25   proof that it was accepted by the IRS and my debt with them

1     was discharged.

2          Q.   Okay.  And you have heard your wife and also the

3     other witness testify about the conversations with Cierra

4     Young about posting and clearing?

5          A.   Yes.

6          Q.   You were present during that one conversation

7     with you, your wife, and Cierra Young, right?

8          A.   My wife had multiple conversations and then she

9     came home from Mr. Paxman's office and said we talked to

10    Cierra West -- or Cierra Young and she said that these

11    posted and cleared the bank.  And, um, I says I would like

12    to hear that.  So a few weeks later we got on the phone and

13    called her and I heard it from her own mouth these posted

14    and cleared.

15         Q.   You wanted to hear that because you were

16    concerned about your debt to the IRS being paid, right?

17         A.   Correct.

18         Q.   So these checks were basically, most of them not

19    all of them, but the eight of them, I think, or nine, were

20    basically on a Chase Bank account, right?

21         A.   Um, 12 of them were.

22         Q.   Okay.  And the ones that eventually the testimony

23    has been that they did not clear the bank?

24         A.   Um, there was eight -- there was nine of them

25    that were sent out and they did not submit them for

1    processing.

2         Q.   Okay.  And the other four, at least the IRS has

3    testified they didn't get money from the four of these

4    checks?

5         A.   The five, the four for 425 and the one for

6    81,866.

7         Q.   Okay.  And did anybody contact you from Chase

8    Bank saying hey these checks or EFTs did not go through,

9    they're on closed accounts?  Did anybody from Chase Bank

10   contact you?

11        A.   No.  Here is the interesting thing.  If you tally

12   up all of the those amounts that I sent out, those 13 EFTs,

13   they tally over $4,000,000.  If you read in the newspaper,

14   people that write bad checks for 25, 50, $100.00, they write

15   just a few of them and my gosh the police are after them.

16   Um, I wrote 13 EFTs to the tune of over $4,000,000 and I

17   never once had the bank contact me, the FBI contact me, the

18   local police, no one contacted me.  I found that very

19   strange if I had done something wrong but I hadn't.

20        Q.   Is it your understanding that EFTs are a valid

21   way to pay a debt?

22        A.   Well, um, I was told by Revenue Officer Yvonne

23   Poulsen, in the presence of Darla Black in her office, that

24   she told me that EFTs at one time were accepted by the IRS

25   but they don't accept them any more.  So they were valid at

1    one time, she's saying, and I don't know when they changed

2    that policy, but that's what I was told.

3         Q.   But sort of in summarizing, everything you did in

4    this case here to pay the IRS off, was you were trying to

5    implement what you learned at the seminar?

6         A.   Correct.

7         Q.   You had no intent to defraud the IRS, did you?

8         A.   No, I wanted just to pay them.

9         Q.   And, in fact, you kept paying -- I think the

10   evidence was you paid in 2011, 2013, 2014 you're still

11   paying the IRS?

12        A.   I was.

13        Q.   You still are, aren't you?

14        A.   Yeah.

15        MR. MCCAUGHEY:   That's all.

16        THE COURT:   Cross-examination?

17        MR. KAMEROS:   Thank you, Your Honor.

18                          **CROSS-EXAMINATION**

19   BY MR. KAMEROS:

20        Q.   Good afternoon, Mr. Hansen.

21        A.   Hi.  How are you?

22        Q.   So I may cover some of the material you have

23   already discussed with your attorney, I apologize if this is

24   a little bit redundant, my understanding is that during the

25   years 2005 through roughly 2012 you were a chiropractor and

1    then you were in the health supplement business?

2         A.   I was a chiropractor up until my mother died in

3    2010.  When she died, my father was 88 years of age, was

4    just starting to have the beginnings of dementia, and I

5    opted to quit practice and take care of my father during the

6    day at his home.

7         Q.   And each of the years that we're talking about in

8    this case, 2005 through 2012, you earned income from your

9    businesses and you filed federal income tax returns,

10   correct?

11        A.   I did.

12        Q.   And those returns accurately recorded your income

13   and your expenses and your tax liability, right?

14        A.   I believe they did.

15        Q.   And you actually paid some of the tax that was

16   reported as due on those returns, right?

17        A.   Yes.

18        Q.   And when you paid those taxes to the IRS, they

19   were drawn on checks, they were checks drawn on your own

20   personal accounts, correct?

21        A.   On my business accounts through Wells Fargo Bank.

22        Q.   And we have seen some of those checks in evidence

23   today, right?

24        A.   Yes.

25        Q.   And both of those accounts that you used to write

1    checks to the IRS, or the one account, it was open at the

2    time you wrote the check?

3         A.   The two Wells Fargo accounts that I had were open

4    accounts.

5         Q.   And they had funds in them sufficient to cover

6    the checks that you wrote?

7         A.   Most of the time they did.

8         Q.   Okay.  And there were actually payments made to

9    the IRS that we have seen in 2012 and 2013 that were -- that

10   one was a cashier's check and the others were checks drawn

11   on your own personal accounts, right?

12        A.   Yes.

13        Q.   And that was after you sent the EFT checks to the

14   government, right?

15        A.   Yes.  Yes.

16        Q.   And the reason you wrote those checks is because

17   you knew you still owed the government a lot of money,

18   right?

19        A.   Um, I didn't know that for surely but Revenue

20   Officer Darla Black said adamantly, no, your EFTs did not go

21   through.

22        Q.   Okay.  And you knew that before you met with

23   Darla Black, right?

24        A.   Um, I wasn't really certain yet because I had

25   conflicting information.  I didn't have any -- usually if

1      you have a bad check, they're returned.  I didn't have

2      anything returned, so I thought on one hand, um, I didn't

3      have anything returned saying non-sufficient funds and I

4      mean like anybody else, I've bounced a few checks in my life

5      and I see what they look like, the face, but I didn't get

6      any of those.  On one hand, I'm getting Cierra Young said

7      that they posted and cleared the bank, but on the other

8      hand, I'm getting Revenue Officer Darla Black saying oh, no,

9      those -- those weren't any good.

10         Q.   Now, you heard the bank witnesses testify about

11     those checks, correct?

12         A.   Yes.

13         Q.   And they said that they don't return -- first of

14     all they said they don't return checks that are drawn on

15     closed bank accounts.  Do you remember them saying that?

16         A.   Yes.

17         Q.   And moreover, none of those checks had your name

18     on them, did they?

19         A.   They did not.

20         Q.   They didn't have your address on them?

21         A.   They did not.  They had my son's.

22         Q.   So they had no way to send anything back to

23     you --

24         A.   No, they would have been --

25         Q.   -- since your address was not on the checks,

1       right?

2               A.   They would have been sent to my son.

3               Q.   Let me direct your attention to Government

4       Exhibit -- I believe it is 26, and the last page of that

5       exhibit.  Maybe I'm at the wrong one.  Hang on one second.

6       Exhibit 25, can you pull that up, please?  Do you see the

7       document on the screen there?

8               A.   I do.

9               Q.   Okay.  And that has your name on it, correct?

10              A.   It does.

11              Q.   And this notice was sent to you, is that right?

12              A.   Um, I guess so.

13              Q.   Okay.  And it says that they're rejecting the

14      $425,000.00 payment because the account was closed, correct?

15              THE COURT:  I don't believe this is in evidence.

16              MR. KAMEROS:  It is, Your Honor.

17              THE CLERK:  It is.

18              THE COURT:  It is?  Okay.  Go ahead, I'm sorry.

19              Q.   (By Mr. Kameros)  And they're saying there that

20      they're rejecting your $425,000.00 payment because the

21      account was closed, correct?

22              A.   Okay.

23              Q.   And the date of the notice there is July 6th of

24      2012, right?

25              A.   Okay.

1       Q.   So you were notified on July 6th of 2012 by the

2  IRS Fresno Service Center that this check had been rejected

3  because the account was closed?

4       A.   Do you have proof of mailing on this?  I really

5  don't recall getting this, but do you have proof of mailing?

6       Q.   It was -- is your testimony you did not receive

7  this?

8       A.   I cannot remember.  That's why I'm asking you do

9  you have proof of mailing?  Prove it to me that I did

10  receive it.

11       Q.   I ask the questions.

12       A.   Oh, sorry.

13       Q.   Did you receive this or not?

14       A.   I can't remember.

15       Q.   Okay.  Now, you heard the -- or you saw -- you

16  heard from the witness from Wells Fargo Bank and you saw the

17  checks that were drawn on your accounts to pay the mortgage

18  at the house where you lived, correct?

19       A.   Yes.

20       Q.   And you also tried to pay off your mortgage with

21  one of these checks, didn't you?

22       A.   Yes.

23       Q.   You wrote a $225,000.00 check to Bank of America

24  on June 25th of 2012, tried to pay off your mortgage, right?

25       A.   Yes.

1      Q.   And they rejected that check, didn't they?

2      A.   No, they did not.

3      Q.   But you paid -- they didn't?

4      A.   No.

5      Q.   They accepted it?

6      A.   No.  We got a statement in the mail the next

7   month for payment for the next monthly payment and the

8   mortgage was reduced to under $2,000.00.

9      Q.   But you continued to pay your mortgage, monthly

10   mortgage after that, right?

11      A.   They -- they reversed it a number of weeks later,

12   but according to UCC law, you cannot reverse things once

13   they're posted.

14      Q.   But you had been continuing to pay your mortgage,

15   right?

16      A.   We had been continuing to pay our mortgage

17   because we didn't want to be pushed out of the house and

18   we're still pursuing this legally and, um, the matter is not

19   resolved yet.

20      Q.   But the bank -- you knew -- you knew that the

21   bank had rejected that check, correct?

22      A.   They rejected it after they accepted it.  You

23   can't do that according to banking law.

24      Q.   Well, but you knew they had rejected it?

25      A.   So we safely went ahead and kept paying it until

1        we could take this to court --

2               Q.   And that's another indication --

3               A.   -- which we are planning to do.

4               Q.   I'm sorry --

5               A.   I'm not finished yet.  Go ahead.

6               Q.   Well, you have to answer my questions and then

7        stop.

8               A.   I wasn't finished.

9               Q.   That is another indication that you were notified

10       that checks drawn on closed accounts with the word "EFT" on

11       them don't work, correct?

12              A.   No, that is not correct.

13              Q.   Now --

14              A.   When they --

15              Q.   You answered my question.  Thank you.

16              Now, you have covered some of this in your direct

17       testimony, but you were contacted by someone at Berkshire

18       Capital in early 2011 about tax liens the IRS had on you,

19       correct?  Is that right, were you contacted by someone?

20              A.   I don't have any tax liens.

21              Q.   Well, they contacted you -- why did they contact

22       you then?

23              A.   Because of -- I don't know the mechanism of how

24       they can find out that someone owes tax, but I have no

25       liens.  I have contacted the State of Utah and they show

1    that I have zero liens on my name.

2         Q.    This is back in 2011.  Didn't you just testify on

3    direct examination that the folks at Berkshire Capital

4    contacted you because they found out that you had IRS tax

5    liens?

6         MR. MCCAUGHEY:  Objection, Your Honor, that

7    mischaracterizes his testimony.  He didn't testify to that.

8         MR. KAMEROS:  Yes, he did.

9         THE COURT:  Members of the jury will have to be -- use

10   their recollection of what the testimony was.  The objection

11   is overruled.

12        THE WITNESS:  I will say that they contacted me

13   because I owed the IRS, not because I had IRS liens.

14        Q.    (By Mr. Kameros)  And you agreed to hire them to

15   help you resolve your tax debt with the IRS, correct?

16        A.    Yes.

17        Q.    And you paid them, you said, a retainer of more

18   than $6,000.00 for that, right?

19        A.    Correct.

20        Q.    And this was because you knew you owed a

21   substantial amount of tax and you wanted to pay it off,

22   right?

23        A.    The IRS says I still owed them money so I went

24   ahead and went forward.

25        Q.    And let me step back a second.  You testified on

1    direct that the reason you got into all this trouble with

2    the IRS is because you had bills to pay related to your

3    house, correct?

4         A.   Correct.

5         Q.   So you chose to pay those bills but not your

6    taxes, right?

7         A.   Um, because those were pending right then and

8    there.

9         Q.   Okay.  And you didn't borrow any money to pay

10   those bills, right?

11        A.   No.

12        Q.   You could have borrowed money though, right?

13        A.   No.

14        Q.   Why not?

15        A.   Because I had just borrowed money, a lot of

16   money, for our building construction loan.

17        Q.   And no bank would -- no bank would extend you

18   credit, is that what you're telling us?

19        A.   The problem -- because my builder fell 30 feet to

20   the ground off of scaffolding at my home he was in a

21   hospital bed at his home for over four months recovering

22   before he could come back to work.

23        Q.   And that's why you couldn't get a loan to pay the

24   contractors so you could also pay your IRS, your tax debt?

25        A.   I was overdrawn on that and we extended it out as

1    long as possible.

2         Q.   When did this, the construction project, begin?

3         A.   Um, I don't recall.

4         Q.   This is the bane of your existence and you can't

5    recall the date?

6         A.   No, it's the nightmare of my existence.

7         Q.   And you have no idea what date it is?

8         A.   I cannot remember the exact date, no.

9         Q.   So you retained Berkshire Capital to help you

10   with your tax problem, right?

11        A.   Correct.

12        Q.   And Mr. Gallagher helped you put together a

13   financial statement for that purpose, right?

14        A.   Yes.

15        Q.   And that was in May of 2011 and you signed that

16   document knowing that that was going to be used to work with

17   the IRS to resolve your tax problems?

18        A.   Correct.

19        Q.   And then let's see, um, and then in March of --

20   March 7th or 8th you received a Form 4033D from the IRS

21   saying that you owed more than $342,699.00 in taxes,

22   penalties, and interest, correct?

23        A.   Correct.

24        Q.   And that's in evidence, Mr. Trebesch talked about

25   sending that letter, correct?

1   A. Yes.

2   Q. And did you tell -- did you call Gallagher to

3 tell him you received this notice?

4   A. No.

5   Q. Oh, and by the way, you testified that you

6 received an e-mail that said that the IRS wanted $50,000.00

7 from you in order to begin the process of getting you to pay

8 your tax debt, right?

9   A. Darla Black confirmed that in her testimony

10 Monday or Friday.

11   Q. How did she confirm that?

12   A. She said that Mr. Hansen did not go through with

13 that deal on Berkshire Capital because they wanted

14 $50,000.00 down and he didn't have the money.

15   Q. Where did she get that information from?

16   A. Maybe from me, maybe from them, I don't know.

17   Q. Where is the e-mail?

18   A. I don't know.

19   Q. Did you receive the e-mail that said we need

20 50,000?

21   A. I did.

22   Q. Wouldn't it be important enough for you to pull

23 it off your computer and bring it with you today?

24   A. I get rid of all old e-mail.

25   Q. Did you ask Mr. Gallagher about it when he

1    testified?

2        A.   No.

3        Q.   Why not?

4        A.   Um, he said he did not remember that but Darla

5    Black did.

6        Q.   But Darla Black wasn't involved in negotiating

7    your tax problems with the IRS, Mr. Gallagher was?

8        A.   Yeah.  Darla -- yeah he was and who was he -- who

9    was he talking to to make this deal?  The IRS.  Darla Black

10   works for the IRS and yet Darla Black confirmed here in

11   testimony on Friday that the deal did not go down because

12   they wanted such a large amount down, $50,000.00 which I did

13   not have.

14       Q.   And that's a mischaracterization of her

15   testimony.  Thank you.

16       MR. MCCAUGHEY:  Move to strike, Your Honor.  That's

17   improper.

18       THE COURT:  Yes.  I -- you should disregard -- as I

19   have instructed you, the words of counsel are not evidence

20   and you may not consider it for that purpose.

21       Q.   (By Mr. Kameros)  And then on March 27th you sent

22   Mr. Trebesch a letter saying that you had sent this payment

23   to the IRS to satisfy your tax debt, correct?

24       A.   Correct.

25       Q.   Um, and the purpose of that was to convince him

1    that you had paid your taxes, to leave him alone, the matter

2    was closed, right?

3        A.   It was just to let him know that I had paid that

4    and I was convinced from going to the seminar that this

5    would get rid of my debt.

6        Q.   And then, um, on May 4th, 2012, you sent a letter

7    to the IRS again claiming you had paid the 342,699; is that

8    right?

9        A.   Since, I didn't get any returned check I was

10   convinced that it did pay.

11       Q.   And that's what you wrote in the letter to the

12   IRS?

13       A.   Correct.

14       Q.   And the reason that you sent this letter is that

15   you wanted to make sure that that amount was credited to

16   your IRS account, right?

17       A.   Yes.

18       Q.   Now, we heard Mr. Gallagher testify this morning

19   that he spoke to you on March 19th about the communication

20   he had received the letter 1058 that laid out the amounts

21   that you owed for all of those prior years, correct?

22       A.   Correct.

23       Q.   And you never raised with him during that

24   conversation the fact that you had attended a seminar and

25   were planning on paying your taxes with a check drawn on a

1    closed account, right?

2         A.   No.

3         Q.   And you understood at that time that

4    Mr. Gallagher was an enrolled agent, correct?

5         A.   I really didn't understand that relationship, so

6    no.

7         Q.   But you knew that he had expertise in this area,

8    correct?

9         A.   Correct.

10        Q.   And that's why you hired him?

11        A.   I hired him to go ahead and work a deal with the

12   IRS.

13        Q.   And you've testified that you sent in a number of

14   other checks drawn on the closed Chase Bank account in your

15   son's name, most of them were sent on June 11th, 2012; is

16   that right?

17        A.   11 of them to all 11 payment centers of the IRS.

18        Q.   And you heard Mr. Gallagher testify that he sent

19   you an e-mail in response to your e-mail on June 8th

20   explaining, you know, why you were doing this and he said I

21   have some concerns about it, did he?

22        A.   Most people have never heard about this process

23   have concerns.

24        Q.   And did you respond to his concerns or not?

25        A.   I don't recall.

1          Q.   Well, you went ahead and sent all of those checks

2     in three days later so you ignored his concerns, didn't you?

3          A.   Possibly.  I don't know when I read those e-mails

4     from him.

5          Q.   Well, they were -- they're in evidence.  You're

6     disputing that you received it?

7          A.   Well, receiving it and reading it on another date

8     is two different things.

9          Q.   Now, so you -- you testified you were in the

10    chiropractic business for a number of years, correct?

11         A.   33 years.

12         Q.   And you had some pretty good years in terms of

13    patients that you saw paying you for your services, right?

14         A.   Some years better than others, yes.

15         Q.   Right.  And when your patients paid you, they

16    paid you with cash sometimes?

17         A.   Sometimes.

18         Q.   And sometimes with checks drawn on their personal

19    bank accounts, right?

20         A.   Or insurance checks.

21         Q.   You got paid by insurance companies if they had

22    insurance to cover your services, right?

23         A.   Correct.

24         Q.   Um, and the checks that you got from them were

25    checks drawn on their own personal bank accounts usually,

1   correct?

2          A.   Correct.

3          Q.   And most of the time I'm assuming they cleared?

4          A.   Yeah, but like anybody else, sometimes they

5   bounce.

6          Q.   But these checks were not drawn on closed bank

7   accounts, right?

8          A.   No.

9          Q.   And they were not EFT checks?

10         A.   No.

11         Q.   And had one of your patients given you a check

12  drawn on a closed bank account that said EFT on it, would

13  you have accepted it?

14         A.   I don't know because I never -- it never

15  happened.

16         Q.   Um, so, because it never happened --

17         A.   It never happened so I can't even make that

18  decision.

19         Q.   And then you were -- later on you were in the

20  health care products business and that was in 2011, 2012,

21  2013, correct?

22         A.   Correct.

23         Q.   And 2000 you were -- you made pretty good money

24  in 2011, right?

25         A.   I had a good year, yeah.

1          Q.   And none of those folks paid you with checks

2    drawn on closed accounts with EFT on them, right?

3          A.   No.

4          Q.   And even after you learned about using EFT drawn

5    on closed accounts to pay debts, would you have -- you

6    wouldn't have accepted checks from your customers drawn on

7    closed accounts, right?

8          A.   Um, I don't know.  I just never -- never had

9    anybody submit that to me.

10         Q.   And what if they had?

11         A.   I couldn't say.  It never happened.

12         Q.   Now, so you talked about going to the seminar and

13   learning about EFTs and how you write a check on a closed

14   account with EFT on it and all of the instructions and

15   everything, correct?

16         A.   How you take a check form and convert it to an

17   EFT, yes.

18         Q.   And so we agree that when you write a check on a

19   closed bank account, there is no money in that account,

20   right?

21         A.   No, you're not writing a check, you're writing an

22   EFT on a closed account.

23         Q.   And where does the money come from that goes to

24   the IRS to pay your debt when that check is submitted to the

25   bank?  Where does the money come from?

1          A.    I have no idea.  I just know that it works.

2          Q.    Wait.  So you don't know where the money comes

3     from, but you're willing to write a check, you're willing to

4     write a check on a closed account to pay a legitimate debt

5     to the IRS, but you don't know where the money comes from?

6          A.    My wife can put a key in a car, start the engine,

7     and put it in drive and drive down the street.  She has no

8     idea all of the mechanisms, electronically, mechanically how

9     it works.  She just knows she does this and it works.  I was

10    the same way.  I was maybe naive, but I never bothered to

11    ask.  When people told me these things worked, I really

12    didn't care how it worked just that it worked.

13         Q.    But paying a -- having a tax debt of $342,000.00,

14    that's a serious matter, isn't it?

15         A.    Oh, it is.  That's why I was doing something

16    desperate.

17         Q.    And paying it off is a serious matter too, right?

18         A.    It is.

19         Q.    And so, um, and so, but you -- but you wrote a

20    check numerous checks to the IRS not really knowing where

21    the money came from to pay them, right?

22         A.    I just know that they worked and nobody ever not

23    any of those people had anybody come after them in law

24    enforcement for doing that.

25         Q.    And you never asked Mr. Poulsen about using a

1    check drawn on a closed account to pay your taxes?

2          A.   Mr. Poulsen and I never discussed it with him.

3          Q.   You never discussed it with Mr. Gallagher,

4    correct?

5          A.   No.  Well, um, there was some -- some e-mails

6    about that I believe but I don't recall what was said.

7          Q.   Well, you sent him an e-mail on June 8th and then

8    he responded I have some concerns about this, correct?

9          A.   Yeah, I didn't bring it up to him, he brought it

10   up to me.

11         Q.   Well, because he found out that you had submitted

12   a check drawn on a closed bank account?

13         A.   Correct.

14         MR. KAMEROS:  Can I have one moment, Your Honor?

15         THE COURT:  You may.

16         MR. KAMEROS:  That's all I have, Your Honor.

17         THE COURT:  Any redirect?

18         MR. MCCAUGHEY:  Just a couple of questions.

19                     **REDIRECT EXAMINATION**

20   BY MR. MCCAUGHEY:

21         Q.   Mr. Hansen, do you consider yourself a tax

22   protestor?

23         A.   No.

24         Q.   Have you filed your taxes every year?

25         A.   Yes.

1          Q.   And it was your desperation to pay this tax bill?

2          A.   It was.

3          Q.   That led you to these seminars?

4          A.   I wrote a lot of checks over the years and -- and

5     I -- like I say, I contacted Berkshire, I talked to Darla in

6     her office about doing an offer in compromise.  I just

7     wanted to get on a payment plan that was affordable that I

8     could just go ahead and pay every month so that they would

9     leave me alone.

10         Q.   And you had no intent to defraud the IRS?

11         A.   Absolutely not.

12         MR. MCCAUGHEY:  That's all.

13         THE COURT:  Thank you.  You may step down.

14         THE WITNESS:  Thank you.

15         THE COURT:  Does the defense have additional witnesses

16    to call?

17         MR. MCCAUGHEY:  No.

18         THE COURT:  Any rebuttal evidence?

19         MR. KAMEROS:  No.  We have no rebuttal case, Your

20    Honor.

21         THE COURT:  All right.  That concludes the evidence.

22    Um, members of the jury, this is going to be the closest you

23    will come to being let out of school early for a long time.

24         We are going to excuse you for the rest of the day

25    while I work with the attorneys on the instructions and

1    finalizing the matters we'll need, the evidence.  We will

2    give you final instructions tomorrow morning and then we

3    will hear evidence and the case will -- or hear argument and

4    then the case will then be given to you for your

5    deliberation.

6         Again, you have now heard the evidence but you have

7    not yet heard the court's instructions nor have you heard

8    the closing arguments.  It is still required that you keep

9    an open mind, that you make no decisions about the issues in

10   this case until it's given to you for deliberation, that you

11   do nothing to investigate, research, or read anything about

12   this case and that you don't talk about this case with

13   anyone.  We will see you in the morning at 8:30.

14        THE CLERK:  All rise for the jury.

15        (Whereupon, the jury left the courtroom.)

16        THE COURT:  You may be seated.  If we met at 3:00 to

17   settle the jury instructions would that timeframe work?

18        MR. MCCAUGHEY:  3:00?

19        MR. SUNDWALL:  That's fine with the government.

20        MR. KAMEROS:  Yes.

21        THE COURT:  All right.  We will meet in my chambers on

22   the ninth floor so we can sit around the conference room

23   table and work through the instructions.  Of course

24   Mr. Hansen will be there together with Mr. McCaughey.

25   Mrs. Hansen, if you would like to be there you're invited to

1    be present.

2         MRS. HANSEN:  Thank you.

3         THE COURT:  Of course as we did during the jury

4    selection, you will have to let Mr. Hansen or Mr. McCaughey

5    do the talking.

6         MR. KAMEROS:  Your Honor, just a brief housekeeping

7    matter.  We have a summer law intern who has been assisting

8    us in the jury instruction phase of the case.  Would it be

9    possible for him to attend --

10        THE COURT:  Sure.

11        MR. SUNDWALL:  -- the charging conference.

12        THE COURT:  Of course.

13        MR. KAMEROS:  Thank you.

14        THE COURT:  Sometime between now and tomorrow morning

15   you need to get together with Tracy and verify all of the

16   exhibits that have been received in evidence and then make

17   sure that we have the notebook and the information we're

18   going to provide to the jury agreed upon.

19        Any other issues we should discuss before we

20   re-assemble at 3:00?

21        MR. MCCAUGHEY:  Just one second, Your Honor.  Do you

22   show 74 being admitted?  I may have missed it.

23        MR. KAMEROS:  Our records show that it was admitted.

24        THE COURT:  Michelle, would you step down and look at

25   Tracy's notebook.  She's probably giving the jury some

1  instructions.

2         THE LAW CLERK:  Yes, it has been admitted.

3         MR. MCCAUGHEY:  It is.

4         THE COURT:  Yes, I show it received as well.  Okay,

5  anything else?  We will be in recess?

6         MR. KAMEROS:  Thank you, Your Honor.

7         THE COURT:  Wait just a moment.  We have a question

8  from the jury.  Let me read to you the question and you can

9  discuss how to address it.  One of the jurors, not signed,

10  has handed me the following note.  "What was the timeframe,

11  paren, dates, close paren, that his home problems start,

12  question mark, so we can see the relevance to his tax

13  problems."

14         MR. KAMEROS:  Well, I asked him that question, Your

15  Honor, and he said he didn't know.  I don't have any

16  independent evidence of that so I think the answer --

17         THE COURT:  Well, I think the evidence is closed and

18  you -- you will have to just argue from the evidence but I

19  wanted you to know that they had raised this question.

20         MR. HANSEN:  I would be more than happy to confer with

21  my wife and give you a date.  She's seven years younger than

22  me and has a lot better memory.

23         THE COURT:  Well --

24         MR. HANSEN:  It doesn't matter?

25         THE COURT:  Well, I'm not going to give you advice as

1    to how to proceed.  You can confer with Mr. McCaughey about

2    how you want to address that issue.

3            MR. HANSEN:  Okay.

4            THE COURT:  We'll see you at 3:00.

5            (Whereupon, court adjourned for the day at 1:47 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF UTAH             )

2                              )ss

3    COUNTY OF SALT LAKE       )

4

5             I, Laura W. Robinson, Certified Shorthand

6    Reporter, Registered Professional Reporter and Notary Public

7    within and for the County of Salt Lake, State of Utah, do

8    hereby certify:

9             That the foregoing proceedings were taken before

10   me at the time and place set forth herein and were taken

11   down by me in shorthand and thereafter transcribed into

12   typewriting under my direction and supervision;

13            That the foregoing pages contain a true and

14   correct transcription of my said shorthand notes so taken.

15            In witness whereof I have subscribed my name

16   this 25th day of July, 2017.

17

18                            _____

19                            Laura W. Robinson

20                            RPR, FCRR, CSR, CP

21

22

23

24

25
```